### WHITE v. SCHWEITZER et al.

(Supreme Court, Appellate Division, Second Department. December 28, 1911.)

1. SALES (§ 161*)—PASSING OF TITLE—DELIVERY TO CARRIER.

Under a contract to "sell and to ship to the buyers in New York" a car load of turkeys at an agreed price, less freight, delivery to the carrier by the seller was not a delivery to the buyers, so as to place upon them the risk of transportation.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 377–380; Dec. Dig. § 161.*]

2. CARRIERS (§ 76*)—FREIGHT—LOSS OR INJURY—RIGHT OF CONSIGNEE.

Ordinarily, under a contract to sell and ship poultry, the seller is bound to deliver the shipment to a suitable carrier, properly prepared for transportation, and thereupon the consignee becomes the presumptive owner thereof, entitled to recover for breach of the carrier's duty; as between the parties delivery to the carrier being delivery to the buyer.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 256–271; Dec. Dig. § 76.*]

3. SALES (§ 140*)—BILL OF SALE—NECESSITY.

Under a contract of sale, no bill of sale is required to pass title where delivery is made to the carrier, according to the agreement.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 339; Dec. Dig. § 140.*]

4. SALES (§ 181*)—DELIVERY—ACCEPTANCE—EVIDENCE—SUFFICIENCY.

Evidence *held* insufficient to raise an issue of acceptance by the buyers of a shipment of poultry as affecting the risk of transportation.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 181.*]

5. SALES (§ 178*)—DELIVERY—ACCEPTANCE—EVIDENCE.

Acceptance of goods by the buyer thereof may be implied from circumstances, where he does some act respecting them which necessarily involves the conclusion that he has taken them as owner.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 451–455; Dec. Dig. § 178.*]

Hirschberg, J., dissenting.

Appeal from Trial Term, Nassau County.

Action by William E. White against Nathan Schweitzer and another. From a judgment for plaintiff and from an order denying a new trial, defendants appeal. Reversed, and new trial granted.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before JENKS, P. J., and HIRSCHBERG, THOMAS, BURR, and CARR, JJ.

Gerald B. Rosenheim, for appellants.

Hartwell Cabell, for respondent.

THOMAS, J. [1] The complaint alleges that the plaintiff "sold and agreed to ship to defendants in New York" a car load of turkeys "at an agreed price of eighteen cents per pound, less the freight on said car between Maysville and New York City." The answer, without otherwise denying the allegation, states as a defense that the plaintiff "sold and agreed to ship to the defendants in New York," dry-picked stock, and that defendants "agreed to pay for the same at and after the rate of eighteen cents per pound, less the freight on said car between Maysville and New York City, to wit, f. o. b. New York." I shall discuss only the question whether the delivery to the carrier at Maysville was a delivery to the defendants so as to place upon them the risk of transportation.' There is no evidence of special contract with the carrier on the part of the consignor. But it is shown that, before receipt of the goods, the invoice and bill of lading came to the buyer, and that the seller asked for and received an advance by check (later stopped) on the purchase price, which indicates that the parties did not contemplate that the payment of the whole price should precede delivery of the goods, but that the buyers should make the advancement and pay the freight, to be deducted from the whole sum promised. The goods arrived in New York in bad condition, and one issue is whether this arose during transportation, and, if so, at whose risk.

[2] The seller's legal duty, if further unmodified, was to deliver to a suitable carrier a car load of the goods ordered, properly prepared for transportation. Waldron v. Romaine, 22 N. Y. 368. Thereupon the consignee became the presumptive owner thereof, enabled to recover for breach of its duty against the carrier (Everett v. Saltus, 15 Wend. 474; Sweet v. Barney, 23 N. Y. 335), and as between the parties delivery to the carrier was a delivery to the buyer, and the title thereupon vested in the latter. This rule is elementary. In Krulder v. Ellison, 47 N. Y. 36, 7 Am. Rep. 402, a merchant in New York received from persons in Rochester an order in writing that there be sent them "via canal" goods, later lost in transit. The consignees recovered against the carrier under the above rule. That case presented two facts that do not appear in the present record: (1) The sellers sent the buyers a bill of sale; (2) the buyers directed shipment over a particular line of transportation.

[3] But neither fact affects the result, as no bill of sale is required where delivery is made according to the agreement to a shipper, and the rule is that, in absence of specific directions, delivery may be made to any proper carrier. For instance, in Gilbert v. N. Y. C. & H. R. R. Co., 4 Hun, 378, the delivery of a full car load as ordered had not been made to the carrier. Hence the title did not vest in the consignee, but the rule was recognized that:

"When property is sold to be shipped by cars or other public conveyance, ordinarily the title passes on delivery to the carrier."

In Dutton v. Solomonson, 3 Bosanquet & Puller's Rep. 582, as interpreted in the opinion in Krulder v. Ellison, supra, if a tradesman order goods to be sent by a carrier, though he names no particular carrier, the moment the goods are delivered to the carrier it operates as a delivery to the purchaser. The rule has been the basis of decision in actions against the carrier for loss or injury to the goods, as well as in actions between sellers and buyers. Some exceptions to it have been suggested, as where the consignee agreed to pay the freight, where the consignor had a special contract with the carrier which enabled him to maintain an action, where the buyer was not charged under the statute of frauds, and the further exception has been suggested, where the expense of transportation is borne by the consignor or is included in the whole purchase price. In the case at bar the consignee upon paying the freight could deduct it from the price payable, for it would be a partial payment thereon. None of the conditions, unless it be the last one, is pertinent to the present discussion. If thus far there has been no error in the reasoning, I consider that Mee v. McNider, 109 N. Y. 500, 17 N. E. 424, is decisive, that due delivery aboard at Maysville was delivery to the buyer. In that case plaintiff agreed to sell to defendant 500 bags of cocoa to be shipped by steamer from Bahia to New York for a specified price, "C., F. & I.," meaning cost, freight, and insurance. The agreement was in this signed memorandum:

"Sold for account of Mee, Billings & Co., London, to James McNider .[certain goods] at 59 s. per cwt., C., F. & I., by steamer to N. Y., buyers to furnish cable credit or pay bankers' commission."

The opinion states:

"The price is fixed at 59 s. per cwt., and this is made up of the cost, the freight and the premium of insurance. Thus the purchaser deals with the matter in gross, and not in detail, transacts the various branches of the business with one person instead of three, fixes his liability at a lump sum, and, in case of loss, will recover the amount of his interest under the policy. * * * On the part of the vendor, the shipment by steamer was an effectual appropriation of the cocoa to the buyer, and at that moment the agreement on the vendor's part was executed. The plain obligation of the purchaser, as defined by the written contract, then attached, and he was bound to accept and pay for the cargo at the price named and in the manner specified. It necessarily follows that injury to the cocoa during the voyage was no excuse for nonperformance, and as the amount due, if anything, was conceded, there was no evidence which required the submission of the case to the jury."

It is noticeable that in that instance there was a memorandum of sale, but this is immaterial if all that was required of the seller to perfect the sale and vest the title in the buyer was to deliver to the carrier. The suggestion that, where the buyer is to pay the freight, the title remains in the seller, has no present application. If such be an indication of continued ownership by the consignor, it may be upon the ground that the buyer has not fulfilled the agreement for sale, but here such payment is a part of the purchase price, and the seller did not exact payment before delivery.

In Dutton v. Solomonson, supra, an action against the buyer for the price of the goods, it was stated by counsel that while a delivery

to a carrier is in law a delivery to the vendee, and thereafter the goods remain at his risk, there is an exception when by special contract the vendor is to pay for the carriage, but the court interrupted the argument with the intimation that the delivery to the carrier was delivery to the buyer, and later Lord Alvanley, Ch. J., stated that the "only exception to the purchaser's right over the goods is that the vendor, in case of the former becoming insolvent, may stop them in transitu." In Mee v. McNider, supra, reference is made to Ireland v. Livingston, L. R. (5 H. of L.) 395, where plaintiffs, commission agents at Mauritius, were ordered by defendant at Liverpool to purchase and ship to the latter in England goods at a price covering freight and insurance. The decision involved the issue whether the order was fulfilled in regard to the amount shipped, but the discussion aids present solution. Mr. Justice Blackburn said:

"The terms at a price, 'to cover cost, freight, and insurance, payment by acceptance on receiving shipping documents,' are very usual, and are perfectly well understood in practice. The invoice is made out debiting the consignee with the agreed price (or the actual cost and commission, with the premiums of insurance, and the freight, as the case may be), and giving him credit for the amount of the freight which he will have to pay to the shipowner on actual delivery, and for the balance a draft is drawn on the consignee which he is bound to accept (if the shipment be in conformity with his contract) on having handed to him the charter party, bill of lading, and policy of insurance. Should the ship arrive with the goods on board, he will have to pay the freight, which will make up the amount he has engaged to pay. Should the goods not be delivered in consequence of a peril of the sea, he is not called on to pay the freight, and he will recover the amount of his interest in the goods under the policy. If the nondelivery is in consequence of some misconduct on the part of the master or mariners, not covered by the policy, he will recover it from the shipowner. In substance, therefore, the consignee pays, though in a different manner, the same price as if the goods had been bought and shipped to him in the ordinary way."

In comment upon that case, Danforth, J., said:

"But even that case throws the risk of damage at sea upon the buyer, for he engaged to pay a fixed price in consideration of the shipment in a prescribed manner, and, except the freight, without reference to its actual delivery."

In Davis v. James, 5 Burrow's Rep. 2680, the consignor was allowed to recover for goods lost against the carrier, with whom he made the contract of carriage and paid the freight. In the case at bar there is no evidence of such contract. The consignor did not pay the freight, while the consignee was to pay the freight upon due delivery by the carrier. In Joseph v. Knox, 3 Campbell, 320, the plaintiff was the consignee's agent, resident abroad, and was allowed to recover against the carrier on contract for carriage made by the plaintiff with him, whereby the agent paid the freight. In Brown v. Hodgson, 2 Campbell, 36, the goods were consigned to a merchant abroad, and were in the bill of lading stated to be shipped by order and on account of the consignee, and it was considered that the consignor could not recover against the carrier. Lord Ellenborough said:

"I can recognise no property but that recognised by the bill of lading."

There the contract with the carrier was with the consignee, and made through the consignor as agent. In Dawes v. Peck, 8 Durnford & East's Rep. 330, the seller at London prepaid the freight for carrying goods which were ordered by a buyer at Warwickshire to be sent by a certain carrier. It was decided that the consignor could not recover for loss of the goods upon the ground that the title vested in the buyer.

So tracing back the decisions from Mee v. McNider, 109 N. Y. 500, 17 N. E. 424, through Krulder v. Ellison, 47 N. Y. 36, 7 Am. Rep. 402, to decision preceding 1800, it is found that, in absence of modifying agreement shown by stipulations, usage, or conduct, the vendor, by delivery to some suitable carrier, vests the title to the goods in the vendee. It is suggested that the title does not vest until the buyer has opportunity for inspection. It is a sufficient answer that it would not vest unless the goods ordered were delivered, wherever the place of delivery. In Coombs v. Bristol, etc., Ry. Co., 3 Hurlstone & Norman's Rep. 510, it was considered that the goods could not vest by delivery to the carrier unless the statute of frauds were satisfied. If delivery to the carrier is delivery to a bailee on the buyer's account, as stipulated by the parties, the possession passes out of the vendor to one holding it for the buyer. The carrier receives in such case for the buyer. Scharff v. Meyer, 133 Mo. 428, 34 S. W. 858, 54 Am. St. Rep. 672; Bailey v. Hudson River R. R. Co., 49 N. Y. 70, 76; A. J. Neimeyer Lumber Co. v. Burlington & M. R. R. Co., 54 Neb. 321, 74 N. W. 670, 40 L. R. A. 534. In conclusion, it should be noticed that while the fact that the consignee paid the freight was regarded as material in Hunter v. Kramer, 71 Kan. 468, 80 Pac. 963, yet such fact alone does not overthrow the presumption that the delivery to the carrier under the circumstances here present is a delivery to the vendee. A. J. Neimeyer Lumber Co. v. Burlington & M. R. R. Co., supra, following Wagner v. Breed, 29 Neb. 720, 46 N. W. 286.

I concur with Mr. Justice BURR for reversal upon the ground that there is no evidence of acceptance of the goods on the part of the defendants.

BURR, J. [4] I concur in the opinion of Mr. Justice THOMAS as to the place of delivery. If that were the only question in the case, our affirmance of the judgment would necessarily follow. But there are two other questions: First, whether there is any evidence of acceptance on the part of the defendants; and, second, whether the verdict is against the weight of the evidence. Respecting the former question, it is impossible to determine whether the jury held the defendants liable because the contract was for scalded instead of dry-picked turkeys, and found that plaintiff's assignor had fulfilled its contract, or because defendants had accepted scalded turkeys as a fulfillment of such contract, even though not in accordance with the agreement made. If, therefore, the question of acceptance should not have been submitted to the jury, the judgment must be reversed. The jury were first instructed to pass upon the controverted question

in the case, whether the turkeys were to be dry picked or scalded. They were then told that, even if the agreement was for dry-picked turkeys, yet "if defendant at that time" (when the turkeys arrived in New York) "dealt with this property as his own, and in the manner as one would with his own, you may infer from that an acceptance by him of the property." At the close of the charge the court was asked to charge that, "if there is an acceptance, that is the end of it, whether it was ordered dry-picked or scalded"; and the court replied: "Yes," adding, "if instead of delivering dry-picked, scalded turkeys were delivered and accepted by the defendant, then the defendant still would be liable, for the acceptance in itself would be a waiver of all objection to the condition of the car." I am a little in doubt as to the meaning of the expression "objection to the condition of the car," but, construing it as meaning the condition of the contents of the car, there was no evidence in the case that the defendant dealt with the property as his own, or in the manner in which one would deal with his own. Immediately upon the arrival of the turkeys on the 23d of November, and as soon as their condition had been ascertained, defendant telegraphed to Manchester, the agent of plaintiff's assignor, the Keystone Commercial Company: "Your car arrived Scalded instead of Dry Picked stock, sticky, cannot use it, wire instructions"—and later in the day telegraphed again: "Having railroad inspector examine car. Will put in claim for you. Have turned car over to House that can sell such stuff." On the same day defendant wrote to Manchester, the agent of the Keystone Commercial Company, stating that upon examination the turkeys were found to be scalded instead of dry-picked. After referring to the telegram, defendant's letter continues:

"Inasmuch as we have no trade for that class of goods, it was absolutely useless for me to try to dispose of them, so that I turned the entire car over to the firm of J. & G. Lippman, a reliable commission house, in New York, to be sold to the best possible advantage. I endeavored to have the railroad inspector examine this car of goods so that the claim could be put in for damages, which was due no doubt, to the delay in delivery, but up to this writing, we have been unable to reach the inspector. This whole affair is horribly disappointing to me, as I expected that you would send me a nice lot of goods for the holidays, and found at the last moment that it was necessary for me to go out on the open market to try and secure good stock for my trade. * * * I do not know just how I will make out with the sale of these goods, but in the event of any deficiency, I will expect you to make good."

The next day, on the 24th of November, defendant wrote again to Manchester:

"We have arranged with the firm of J. & G. Lippman, who had the car of these turkeys, to make their return to you direct. Your claim with the railroad company will, therefore, be the difference between the returns, as represented by the account sales, and their value at eighteen cents per pound. You have a perfectly just claim against the railroad company for damages caused by failure to deliver the goods on time, and, if there is anything that we can do at this end to facilitate the progress of this claim, we will be only too willing to assist you. * * * It is to be regretted, though, that this has occurred, for we could have used your goods to the best advantage. had they been in good order, even if they were scalded, and not dry picked. Provided their condition was good, they would have had a ready sale on

this market, and we would have been reasonably priced at eighteen cents. Let me know how you make out in your controversy with the railroad company."

Although the telegrams were received by Manchester upon the same day they were sent, and the letters in due course of mail, no attention was paid by him to the matter, and on the 27th of November defendant wrote again:

"We are at a loss to understand why you have not paid any attention whatever to our messages or letters, and we wired you this morning as follows: 'Hearing nothing from you have stopped payment check. Return our draft.' * * * This leaves the matter in your hands, so that you can readily determine from the account sales from Messrs. J. & G. Lippman just what your damage is."

Thereafter Manchester wrote the defendants as follows:

"Your telegram received as follows, 'Hearing nothing from you have stopped payment check return our draft.' I have forwarded your letters and telegram to the home office in Pittsburg, for adjustment."

Nothing further was done by the Keystone Company, and on the 9th of December J. & G. Lippman sent to them an account of the sales, with a check to balance, and a letter as follows:

"We beg to hand you herewith account sales covering car load of poultry turned over to us for disposition for your account by Nathan Schweitzer and wish to advise the condition of this poultry on arrival as follows: The turkeys were badly overscalded, and owing to the unfavorable weather prevailing during transportation, and at the time of the arrival of these goods, weather being very warm, murky, and foggy, the same were in very bad and slimy condition, foul smelling, and showing decay, and it was absolutely necessary to move the same very promptly, in order to avert a total loss on the same. We want to assure you in this transaction, that in the handling of this car every effort was put forth in order to obtain every dollar possible for the same, and you have our assurance that this car load of poultry was handled to the very best possible market advantage here, and at full market value, consistent with its condition on arrival."

It was not until five days after that that the Keystone Company refused to accept the statement and returned the check to J. & G. Lippman, with a letter containing the following statement:

"If, Mr. Schweitzer turned the shipment over to you for sale for account of the Keystone Commercial Co., he had no authority from that company or any one representing it, to take such action."

That the goods were in the condition testified to by the defendant, and that it was absolutely necessary to immediately dispose of the car load of poultry, is not disputed. Upon this evidence the court should not have submitted to the jury the question of an acceptance implied from circumstances, and the exceptions to the charge were well taken.

[5] Acceptance may be implied from circumstances where the purchaser does some act in relation to the specified goods which necessarily involves the conclusion that he has taken them as owner. Williston on Sales, § 77; Id. § 483. While a resale is ordinarily evidence of acceptance, it is not always so. Id. § 498; Descalzi Fruit Company v. Sweet & Son, 30 R. I. 320, 75 Atl. 308, 27 L. R. A. (N. S.) 932, 136 Am. St. Rep. 961; Rubin v. Sturtevant, 80 Fed. 930, 26 C.

C. A. 259; Hitchcock v. Griffin & Skelley Co., 99 Mich. 447, 58 N. W. 373, 41 Am. St. Rep. 624; Jones v. Bloomgarden, 143 Mich. 326, 106 N. W. 891; Barnett & Company v. Terry & Smith, 42 Ga. 283. In Williston on Sales, supra, the author says:

"It not infrequently happens that the seller, when notified that the goods are not in conformity with the contract and when requested to remove them, fails to do so, claiming that the contract has been properly fulfilled. Under these circumstances it may be clearly the best thing to do, from a business standpoint, for the buyer in whose possession the goods are to sell them at once, and leave the question whether the goods fulfilled the terms of the contract or not to subsequent determination. Where goods are perishable or expensive to keep, or of fluctuating value, any other course is attended with loss to one party or the other. Accordingly it has been held, and it seems reasonable, that the buyer, though refusing to take title because the goods are not what he bargained for, may, after notifying the seller of his rejection and requesting him in vain to remove the goods, resell them on the account of the seller."

In the Descalzi Case it appeared that a cargo of peaches was shipped to the defendant, who declined to receive them because they were not in accordance with the contract. Upon the arrival of the car at Providence, the defendant telegraphed the plaintiff refusing to accept the same. The plaintiff replied, insisting upon acceptance, and the defendant then answered:

"Will not accept. Using best judgment for you. Forwarded Boston."

It appeared that there was a firm of commission merchants in Boston who made sales of peaches of the kind and quality which had been shipped. It was there sought to hold defendant upon the ground of an acceptance, and the court in its opinion says:

"The plaintiff contends that, even if the peaches shipped by them were not the quality contracted for, the defendant by causing the goods to be resold for the benefit of the plaintiffs exercised such a dominion over them as to constitute an acceptance of the same. * * * It is proper to consider the circumstances in which the defendant found itself. * * * A car load of perishable goods abandoned by the owner had been left in its charge by the railroad company which looked to the defendant for payment of freight. In order to save the goods and protect the owners to any extent, immediate action was imperatively necessary. * * * In the absence of the plaintiffs unrepresented, the defendant, having knowledge of the existing condition and having the goods cast upon it, in this emergency, not only had the right to protect itself in the freight charges, but also to prevent the owners from needlessly sacrificing their goods without benefit and at a total loss to themselves. * * * The defendant was therefore justified in forwarding the fruit to be sold for the benefit of the plaintiff and by so doing did not accept the goods."

In Rubin v. Sturtevant, supra, furs were shipped from New York to the defendants at Zanesville, Ohio. They declined to accept a portion of them, and plaintiffs, being notified, insisted upon the contract. Thereafter the defendants sold them at auction. Their course was held not to constitute an acceptance. The court say:

"In the present case the defendants elected to rescind, and were entitled to rescind, that part of the goods which did not correspond with the warranty; but by the refusal of the plaintiffs to receive the returned goods they found themselves in the custody of the goods at a distant city. It then became proper for them, if it was not obligatory, to take such measures as

would be most expedient to save unnecessary loss to the plaintiffs. If they had stored them, they would have been entitled to recover the reasonable expenses. If it was more expedient to sell them and they have exercised reasonable diligence in selling them, they only become responsible for the proceeds."

In the case of goods that are not perishable, it may be that before selling it would be the duty of defendants to store the goods in order to enable plaintiffs to reconsider their previous determination (H. Herrmann Lumber Co. v. Heidelberg, 46 Misc. Rep. 465, 92 N. Y. Supp. 256), and, if there had been opportunity to notify the plaintiffs of an intention to sell on their account before doing so, the failure to give such notice might have been a circumstance to be considered in determining the effect of defendants' conduct. But if it is impracticable to give extended notice, or impossible to give any notice, it may be that a sale without notice will not be evidence of acceptance. Hitchcock v. Griffin & Skelley Co., supra. In that case the court say with regard to a carload of California oranges:

"It is further contended that the sale by Kean & Co., without notice, was an acceptance of the fruit in fulfillment of the contract. The evidence showed a notice to the agent and a letter to defendant, both of which were disregarded. Kean & Co. had paid $300 freight, and had obligated themselves to pay for the goods by reason of the acceptance before an opportunity was given them to see the oranges. The court instructed the jury that if defendant never received any notice of a rejection by Kean & Co., or that Kean & Co. would sell the same for its benefit, Kean & Co. had no right to charge defendant with any loss incurred in the sale of the oranges. Blodgett had been notified, and said he would wire defendant, and the evidence shows that defendant was not disposed to take any notice of Kean & Co.'s complaint. Under such circumstances, they could do no less than sell the fruit. It was perishable fruit, and to have done less could not be justified."

In this case the perishable character of the commodity did not permit any extended notice. But it appears without dispute that on the 23d of November defendants notified plaintiff's assignor of their intention to sell, and, although that notice was received by the agent of the Keystone Company on the same day, no objection was made to the course proposed, and the sale was not in fact had until some days afterward. In the interval there was ample time for the seller to protest against the proposed sale. Its failure to do so must be deemed an acquiescence to the extent that such sale may not be deemed to be evidence of acceptance. As there was no other evidence of acceptance, this issue should not have been submitted to the jury. Personally, I am of the opinion that, upon the question of whether the turkeys should be scalded or dry picked, the weight of evidence was with the defendant. As a majority of my associates are of the opinion that defendant's appeal must prevail upon the ground previously stated, and have not passed upon the question of the weight of the evidence, I forbear the discussion of it.

The judgment and order appealed from must be reversed and a new trial granted, costs to abide the event.

JENKS, P. J., and CARR, J., concur in both opinions. HIRSCHBERG, J., votes to affirm.